## JACKSON v. HANSARD
(No. 1751; Jan. 4, 1933; 17 Pac. (2d) 659)

For the appellant there was a brief and oral argument by *R. R. Rose,* of Casper, Wyoming.

For the respondent there was a brief by *Gillette & Clark*, of Denver, Colorado, and *Durham & Bacheller*, of Casper, Wyoming, and oral argument by *Mr. Henry H. Clark*.

BLUME, Justice.

The plaintiff in this case, Fred V. Jackson, brought this action to recover damages from the defendant, Dr. Hansard, on account of malpractice. He claims that on May 28, 1929, while the defendant performed an operation on him for appendicitis, he negligently left a large sponge in the plaintiff's abdominal cavity; that the sponge, or gauze — the terms being synonymous — gradually worked its way through the wall of the large intestines, about five feet in length, and was discharged from the intestines through the rectum on September 7, 1929, three months and ten days after the operation in May; that as a result of such negligence he suffered intense pain and became afflicted with tuberculosis. The jury brought in a verdict for the plaintiff for $10,820.00. Upon motion of the defendant the court directed a judgment notwithstanding the verdict, and from that judgment the plaintiff has appealed, claiming that the

evidence in the case was such as to require the case to be decided by the jury.

The plaintiff, when on the witness stand, claimed that soon after his operation he commenced to have severe pains in his abdomen; that after remaining in the hospital for about ten days, he was thereafter removed to his home, where he remained about six weeks; that during that time he saw and consulted the defendant a number of times, complaining of his condition; that he was given medicine from time to time but that it had little effect; that until the gauze was removed he had no normal bowel-movement; that griping pains would generally set in whenever he ate anything; that he became afraid to eat at all; that he went back to work in a cleaner's establishment about six weeks after the operation, but that he was weak and could do but little work; that he remained at work about four months; that thereafter he sought relief at the hospital of Mayo Brothers; that he was thereafter at the hospital of the Veterans' Bureau at Sheridan, which appears to be a hospital for those somewhat mentally deranged; that he remained there about twenty-three days; that he then sought relief in California but found little; that in the summer of 1930 he worked at the Texas Refinery doing some manual labor in the yards and in a tin shop, but that he was so weak that he had to quit; that he was thereafter sent to a hospital at Fort Lyon, Colorado, and found that he was afflicted with tuberculosis.

1. The first point to be decided is as to the sufficiency of the evidence on the question as to whether or not a sponge was left in the plaintiff's abdominal cavity at the time of the operation in May, 1929. The defendant admitted that he performed that operation, and that large and small sponges were used in connection therewith; further, that he removed some gauze from the plaintiff's rectum on September 7, 1929. Three nurses attending the operation all testified that the sponges used in connection therewith were checked and re-checked, and that none were missing.

Dr. Morad, who assisted the defendant, testified that none were left in the plaintiff's body. The defendant's testimony is to the same effect. He further stated that he not only asked the nurses to count the sponges and that they told him that the count was correct, in which he was corroborated by the nurses, but that furthermore he carefully inspected the field of operation and that no sponges were left in the abdomen. Other physicians testified that the course pursued by the defendant is the usual and approved course pursued by all surgeons. And it further appears from the testimony on defendant's behalf that a haemostat was attached to the large sponges used in the operation, and that it was thus substantially impossible for the sponges to become lost.

Plaintiff testified that the gauze removed from him was about five inches wide by thirty-four inches long, although no measurements were taken of it; that it was removed with some difficulty and with much pain to him, and that when Dr. Hansard pulled it, "it felt like something coming from under his ribs and as though his bowels and rectum were pulled out;" that when Dr. Hansard removed it, it was rolled up and about the size of a broomstick. The testimony as to the size, however, was conflicting. Thus, Sam Gilardi testified that it seemed to be about eighteen inches wide and about thirty inches long; that it was medicated gauze, of which he had used a great deal. The witness Lewis Gilardi stated that he did not know how long or wide it was; that it could have been a pocket handkerchief. The witness Lyman Flint stated that it was between three and four feet long and five to ten inches wide. The defendant himself testified that the gauze which he removed from the plaintiff was a strip of cloth, two or two and one-half inches wide and twelve to sixteen inches long; that it was cotton material and of a very fine mesh, closely woven, and was not the same kind of gauze used in the hospital at the time of the operation. The head nurse at the hospital testified that no gauze five inches by thirty-four inches was used in the

hospital, but stated that large sponges, nine inches wide by thirty-two inches long, were used at that time.

In view of the conflict in the testimony, the question as to the size and character of the gauze or sponge removed from plaintiff, and as to whether it was or was not the same kind of gauze as used in the operation, was for the jury.

Counsel for the defendant argue that it is improbable, if not impossible, that a sponge or gauze of the size claimed by the plaintiff to have been removed from him should have penetrated into and passed through the large intestines. Dr. Geis stated that he did not think that during three months and ten days a piece of gauze of the size claimed by the plaintiff would ulcerate into the intestinal tube; that if it had been left in the abdomen, peritonitis would have followed; that plaintiff would have died or would have been at death's door. Dr. Riach testified that if such sponge had been left as claimed, general or local peritonitis would have followed; that if it had ulcerated into the intestines it would not have been expelled through the rectum; that it could in part have gained entrance to the intestinal tract, but that it could not have traveled through the large intestines, issuing out of the rectum. Defendant's testimony was similar in effect.

It was and is the defendant's theory that due to an alcoholic psychosis, the defendant himself inserted the gauze in question into his rectum. It was shown that persons afflicted with such psychosis sometimes insert nails, washers, nuts, spoons, and other things into the various apertures of the body. Dr. Geis testified that at one time he found plaintiff in a mental condition during which he might have inserted the gauze as above stated. Dr. Riach testified that he at one time found plaintiff suffering from a nervous condition; that he was in a state of more or less confusion; that he was very nervous, shaking all over, with a rapid pulse and with the mucous membranes, eyes and throat inflamed, and that the plaintiff admitted that he had been drinking heavily over a period of time; that, at least par-

tially on his suggestion, plaintiff was sent to the Veterans' Bureau hospital at Sheridan, where cases of mental derangement are treated. It appears, however, that plaintiff's intoxication and mental condition above mentioned took place after the removal of the gauze, and he himself testified that he did not drink at all between the time of the operation in May, 1929, and the removal of the gauze in September, 1929, and that he drank to excess only on a few occasions and mainly to relieve his pains. There is some corroborating testimony that he did not ordinarily drink to excess. It further appears from the evidence that it is not likely that he would have swallowed the gauze or sponge in question, and, taking the testimony as a whole, we think that as to whether or not the theory of the defendant heretofore mentioned was correct was for the jury.

Dr. Keith testified that if a sponge is left in the abdominal cavity, as plaintiff claims to have been true in this case, it is kept in constant motion by the peristolic motion of the intestines; that the consequent pressure and irritation produces necrosis of the wall of the intestines and that in the course of time the sponge will ulcerate through the large intestines; that at the same time nature throws out adhesions which wall the foreign substance off from the abdominal cavity, putting it in a pocket; that hence the contents of the bowels escape into this pocket rather than into the abdominal cavity; that the sponge, moving and working its way into the large intestines, is then gradually moved on with the bowel contents through the rectum; and he expressed it as his opinion that in view of the facts in this case the sponge or gauze removed from the plaintiff was left in the plaintiff's body at the time of the operation in May, 1929. Dr. Keith's testimony, that nature tries to wall off a foreign substance left in the abdominal cavity, is corroborated to some extent at least by the experts called on behalf of the defendant.

Considering the testimony as a whole, and without attempting to state any further details, we think that it was

a question for the jury to determine as to whether or not the sponge or gauze was left in plaintiff's abdominal cavity as claimed. We may summarize the reasons as follows: First, plaintiff testified that he did not insert the gauze into his rectum. Second, the testimony indicates that it is unlikely that the plaintiff swallowed the gauze. Third, it is not claimed that any other operation was performed on the plaintiff after the operation in May, 1929, and if accordingly it is true, as plaintiff testified, that he did not insert the gauze or sponge as claimed, and if he did not swallow it, the only opportunity for the sponge or gauze to get into the plaintiff's body existed at the time of the operation in May, 1929. Fourth, the plaintiff testified that he had continued pains and gripings near the place where the operation was performed and the regions surrounding it, and his recovery from the operation did not proceed in a normal way. Fifth, Dr. Keith testified directly that in his opinion, under the facts in this case, the gauze or sponge in question was left in the plaintiff's body at the time of the operation in May, 1929. Under this evidence, if true, the conclusion would, we think, be justified that the plaintiff's claim in this case that the gauze in question was left in his abdomen during the operation in May, 1929, was justified, and that conclusion would not be based upon any presumptions but upon pure matters of fact. It is of course true that it is truly wondrous that a sponge of the size in question can work its way through the large intestines in the manner claimed in the case at bar, and yet this is not the first case in which a situation similar to that has been presented to the courts, as will be noted by examining the cases of Spears v. McKinnon, 168 Ark. 256, 270 S. W. 524; Moore v. Ivey, (Tex. Civ. App.) 264 S. W. 283; Arkridge v. Noble, 114 Ga. 949, 41 S. W. 78. In Ruch v. Johnson, (C. C. A.) 172 Fed. 191, it appears that a sponge left in the abdominal cavity had worked its way into the ascending colon some two and a half to three inches. Counsel for the defendant have sought to distinguish the first two of the foregoing cases because

the subjects of the operations in those cases were females. We are unable to see the distinction. In the Moore case the size of the gauze removed from the plaintiff was about eight inches wide to thirty-two or thirty-four inches in length.

2. What, then, is the resulting responsibility of the defendant? The authorities are not altogether in harmony on this point. While a surgeon performing an operation cannot, ordinarily, be held responsible for the negligence of some one else, it is his duty, we think, to exercise reasonable care in seeing that no foreign substance, which ought to be removed, are left in the body, and this duty, in fact, was recognized by the defendant in giving his testimony. He should not, we think, ordinarily at least, be able to relieve himself of liability for injury to a patient caused by sponges or pads, by an exclusive reliance on a custom or rule requiring the attendant nurse to count the sponges or pads used and removed, and on the nurse's statement as to the count. 48 C. J. 1132; Ault v. Hall, 119 O. S. 422, 164 N. E. 518, 522, 60 A. L. R. 128, and cases cited. On the other hand, he cannot be held responsible for the exercise of more than ordinary care. He is not an insurer against mishaps, as was recognized by this court in Wright v. Conway, 34 Wyo. 1, 241 Pac. 369, 373, 242 Pac. 1107. In Ault v. Hall, supra, the court said: .

"We have also observed that the surgeon is not an insurer of a successful operation, and we do not now go to the extent of saying that the surgeon insures that all sponges will be removed. He is only charged with that degree of care and caution commensurate with the importance of the task he has undertaken."

In Cassingham v. Berry, 67 Okl. 134, 150 Pac. 139, 141, 168 Pac. 1020, it was insisted that a surgeon who leaves a sponge in the abdominal cavity is necessarily negligent. But the court said in answer:

"The doctrine advanced, in this position of the plaintiff, is too exacting for human affairs. It is tantamount to saying that if ordinary care had been used, no mistake could have occurred. It assumes that the exercise of ordinary care would have rendered a human being infallible. And it is a matter of common knowledge, based upon everyday experience, that even in the exercise of the utmost care, all men do make mistakes. And it was not error, under the pleadings and evidence in this case, for the court to instruct the jury that though they believed the defendant left the sponges in the body of deceased, and her death was the natural and proximate result thereof, yet if they also believe from the evidence that the defendant, in performing this operation, exercised ordinary care in keeping track of the sponges, and seeing to it that they were all removed before the incision was closed, he could not be held liable for negligence. The basis and gist of this action was not the result of the operation, but negligence in the performance of it. If there was no negligence in the performance of the operation, then there was no cause of action, and there could be no recovery; if there was negligence in the performance of the operation, then a recovery could be had. Whether or not the defendant exercised that degree of care in performing the operation that the law imposed upon him was the paramount question, and the test of the rights of the parties."

In Rayburn v. Day, 126 Ore. 135, 268 Pac. 1002, 1008, 59 A. L. R. 1062, the court said:

"A failure to remove a sponge would not in all instances constitute a breach of the surgeon's duty to use due care; if such was its essential effect, there was no need to take testimony in this case, because the defendant admitted that he left the sponge in the incision. Yet the concluding portions of each proposed instruction, if given, might have created in the mind of the jurors the conception that the defendant owed an absolute duty to remove all sponges, that a sponge left in the incision constituted a breach of that duty, and that such a breach would render the defendant liable in this tort action. Gillette v. Tucker, 67 Ohio St. 106, 65 N. E. 865, 93 Am. St. Rep. 639; Akridge v. Noble, 114 Ga. 949, 41 S. E. 78, and Palmer v. Humiston, supra (87 Ohio 401, 101 N. E. 283), 45 L. R. A. (N. S.) 640, which are relied upon

by the plaintiff, contain general statements to the effect that the surgeon's contract duty is an absolute one to remove all sponges, but they also make it clear that, when a tort action is founded upon a contract duty, due care is all that the law exacts of the physician."

So in the case of Roark v. Peters, 2 La. App. 448, the court said:

"But in a case like the one under consideration, it is not a question whether Doctor Peters possessed and exercised the required degree of skill and learning, for it takes no learning to dictate the necessity of removing a sponge from the patient's body after an operation. He is not charged with lack of skill but he is charged with negligence in failing to remove the sponge. But the above rule is illustrative of the point in this case. That rule requires that a physician or surgeon use reasonable care and diligence in the exercise of his skill and the application of his learning. Not the highest skill possible *but reasonable care and skill.* So it is with reference to the point in the instant case. Doctor Peters was expected to exercise *reasonable care and diligence.* Plaintiff had a right to expect of him reasonable care and diligence and not perfection. Therefore, even if he did leave a sponge in her body, if he exercised that degree of care, diligence and prudence in checking and accounting for the sponges prior to the closing of the wound, which is reasonable and in accordance with the rules and methods practiced by the members of his profession in good standing, plaintiff had no ground to complain. * * * They (these decisions) illustrate the points stressed by counsel but they are in no wise at variance with the general rule that a physician or surgeon is held to no more than ordinary and reasonable care and diligence in keeping track of and accounting for all sponges used in the operation, and that nothing more than reasonable care and skill are required of him in seeing that all sponges, etc. are removed before the wound is closed. The decisions hold that the physician must not rely conclusively upon the count and checking of the sponges by the nurses. He must personally use his own skill and exercise his own faculties in accounting for them. The question whether due and reasonable care and prudence have been exercised by the physician or surgeon is one to be found by the jury or the court and each case must

be determined according to the facts and circumstances surrounding it.''

3. It remains to be determined whether there was sufficient evidence introduced in the case so that the jury had the right to determine whether or not the defendant used ordinary care herein. We think there was. The jury were not bound, under the circumstances, to accept the testimony of the defendant and those who assisted him. The witness Keith, a member of the defendant's profession, testified that an operating surgeon can, if in the exercise of ordinary care, discover any sponge that may be left in an abdominal cavity; that, in fact, there should be no difficulty in locating sponges, if attached to clamps or tapes. True, the testimony on behalf of the defendant shows that a haemostat was attached to all the large sponges, and that it is practically impossible for a sponge so attached to be lost. But if one was in fact left in the plaintiff's abdominal cavity, as the jury determined there was, then the testimony as to the haemostat cannot be taken at its face value. Furthermore all the testimony, including that of the defendant, shows that the operation in May, 1929, was an ordinary one; that there was no undue amount of bleeding in cutting into the abdominal cavity, and that there was no necessity for undue haste. In Brown v. Bennett, 157 Mich. 654, 122 N. W. 305, 307, the court said of a case like that at bar:

''Undoubtedly each case of this nature must stand upon its own facts. The length of time required to perform the operation, the nature of the operation itself, as to whether the field is deep in the abdomen, the number of pads or sponges used to keep the field of operation clear, the opportunity or chance for one or more of the pads to be displaced, rolled upon itself, and hidden, all of these and other considerations measure the required skill and care of the surgeon.''

In Cassingham v. Berry, supra, the court approved of an instruction having this language:

"And in determining what was ordinary care in this instance, you must take into consideration the necessity for prompt and efficient action upon the part of the defendant in stopping the hemorrhage referred to in the testimony and doing the other things necessary in the performance of the operation, the difficulty of the operation, and all other facts and circumstances in connection therewith as were disclosed by the evidence."

A similar thought seems to be expressed in the case of Waldon v. Archer, 20 Ont. W. R. 77, in which it is said in part:

"All present thought that all the sponges had been removed. All, including the defendant, had their minds fixed on completing the operation as speedily as possible lest the patient should die on their hands. The question to be decided was, whether the sewing up of the sponge in the wound, which prima facie might be regarded as negligence, could properly be found to be so in this case. The learned Judge was of opinion and found that, having regard to the facts disclosed in evidence, proper skill and attention were used by the defendant, and the result was the saving of the life of the patient. The failure to remove the sponge could not be regarded as actionable negligence or as more than an accidental, excusable, and condonable slip, or inadvertence, resulting from the critical condition of the patient and the paramount duty of completing the operation in the shortest possible time."

The court apparently thought that if there had been no necessity for haste, negligence might have been inferred. And see also Ault v. Hall, 119 O. S. 422, 164 N. E. 518, 60 A. L. R. 128.

While we do not believe that it would be wise in the interests of society to require too exacting a care of a profession which is, has been, and will be of untold benefit to humanity, still we cannot lay down a rule that the jury

must, necessarily, accept the testimony of the operating surgeon and the nurses and ignore the circumstances shown in a case, for that would mean that recovery would be practically made impossible in every case. And we think that under the evidence in this case as outlined above, the question of due care was not a question of law, but was one for the jury to decide, subject, of course, to the ordinary right of the trial judge in such cases. We have not deemed it necessary to decide whether or not the doctrine of *res ipsa loquitor* should be applied in a case of this character.

It is argued that there was no causal connection shown between leaving the sponge in the plaintiff's body and the injuries claimed by him. We need not enter into any lengthy discussion on this point. It is not necessary to determine whether or not the whole of plaintiff's claim should be taken as true; whether, for instance, the testimony of Dr. Keith, who did not claim to be a specialist on tuberculosis, should be credited in his statement that the tuberculosis of plaintiff and the pains and trouble in connection therewith were the result of leaving a sponge in plaintiff's body. All that would merely go to the measure of damages. There is ample testimony in the record, including that of Dr. Riach, the defendant's own witness, that the leaving of a sponge in the abdominal cavity will cause pains, trouble, and weakness, with which the plaintiff claims to have been afflicted. If that was true, and the other necessary facts were found, plaintiff was entitled to at least some damages.

The judgment of the trial court must, accordingly, be reversed.

Counsel for the plaintiff ask that the verdict of the jury be reinstated. That this court has power to direct that to be done is stated in 4 C. J. 1191. But whether the court ought to do so, is not so clear, with only the cold record before us. In 4 C. J. 1186, it is said:

"While it is the policy of the law to end litigation, whenever possible, by rendering or ordering final judgment on reversal, and it is the duty of the appellate court to look at

the circumstances and conditions of the case to ascertain whether it can properly terminate the litigation in this manner, yet neither under statute nor otherwise, is it absolutely obliged, on reversal, to render or order final judgment, but it is vested with a discretion to either render final judgment, to direct the lower court to enter judgment, or to remand the case for a new trial or other proceedings. The power of an appellate court, on reversing a judgment, to order or direct final judgment should be cautiously exercised.''

The point has been before this court but once, namely, in the case of Caldwell v. Roach, (Wyo.) 12 Pac. (2d) 376. In that case the defendant filed a motion for a judgment notwithstanding a verdict, or in the alternative, for a new trial. The court entered judgment notwithstanding the verdict, and the appellant asked in that case, as counsel for plaintiff here, that we direct that judgment be entered on the verdict. We refused to do so, and entered an order for a new trial, upon the theory that the court would at least have granted that remedy. In Pac. Tel. & Tel. Co. v. Slezack, 151 Wash. 457, 276 Pac. 904, 905, it was held that though the granting of a judgment notwithstanding the verdict was error, the party who obtained such judgment should not be deprived of the benefit of his motion for a new trial. And that was substantially the holding in Floyd v. Colorado Fuel etc. Co., 10 Colo. App. 54, 50 Pac. 864, in which the judgment was reversed and the trial court directed either to enter judgment on the verdict or grant a new trial.

There have been many cases in which the verdict of the jury has been directed to be reinstated. That was done, for example, in Doratio v. Jackson, 174 App. Div. 88, 160 N. Y. S. 266. But the court, in explaining its action, took great pains to show that the verdict, among other things, was not excessive.

In the case at bar there was, technically speaking, only a motion to have judgment entered notwithstanding the verdict. Yet in that same motion, there was, aside from

other matters, an allegation ''that the verdict of the jury is excessive, and appears to have been given under the influence of passion and prejudice''—an allegation which can have no proper place except in a motion for a new trial. And it has been earnestly argued here that the verdict was thus obtained. Further, the motion asked that the verdict of the jury be set aside for the reason that ''it is not sustained by sufficient evidence, and is contrary to law''—statements wholly proper in a motion for a new trial. Furthermore, it appears to be generally held that a court of general jurisdiction has, in the proper case, inherent power to grant a new trial *sua sponte*. 46 C. J. 283-285. We think, however, that, without passing on that point, we cannot be far from wrong, if we disregard a technical point herein, and treat the motion herein filed as one for a new trial as well as a motion for judgment notwithstanding the verdict, and on the whole, we believe it best, and as apt to lead to greater justice, to reverse the case with directions to the trial court either to enter judgment on the verdict, or, if that is not deemed advisable, to pass upon the motion for a new trial, and grant a new trial, if that is deemed proper, and which course, if adopted, would not, we think, be an abuse of discretion. Or the court may make and enter such other order herein which may be deemed just, and which is not inconsistent with this opinion. An order, as indicated, will, accordingly, be entered in this court.

*Reversed and Remanded.*

KIMBALL, Ch. J., and RINER, J., concur.